UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CASE NO.

**MARSHALL ELLZEY** **05-11173**
SECTION A
DEBTOR CHAPTER 13

**REASONS FOR DECISION**

On June 5, 2009, the Court heard the Motion to Deem Mortgage Paid in Full with Request for Damages, Contempt, and Sanctions for Stay and Discharge Injunction Violations ( "the Motion"). At the conclusion of the hearing, the Court gave counsel a deadline of June 12, 2009, on which to file simultaneous briefs. After the filing of briefs, the Court took the matter under advisement.

**Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157.[1]

**Facts**

Colonial Mortgage and Loan Corporation ( "Colonial") held a mortgage on Debtor's property at 2327 Spain Street, New Orleans ("Spain Street").

On December 10, 2004, Colonial, through its attorney, Irl Silverstein, filed a Petition for Executory Process to foreclose on Spain Street ("the Foreclosure Suit").[2] The Foreclosure Suit states that Colonial was owed $12,080.41, plus $1,112.74 for insurance premiums paid, interest at

---

[1] The Fifth Circuit stated in *In re Gavin*, 200 Fed.Appx 293, 299 (5th Cir. 2008), that "[a] proceeding to enforce a discharge injunction is a core proceeding" over which bankruptcy courts have jurisdiction.

[2] Exhibit Debtor 6 en globo.

1

the rate of 17.97% from November 4, 2003 until paid, and 25% attorney's fees on principal and interest owed.

Marshall Ellzey, Jr. ("Debtor") filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on February 2, 2005 ("Petition Date").

Under Debtor's chapter 13 plan filed on April 11, 2005 ("Plan"), Debtor proposed to pay Colonial its loan balance with interest through monthly installments of $333.33 through the Chapter 13 trustee ("Trustee").[3] The Plan did not call for any "direct" payments to Colonial outside of the Plan. The Plan was served on both Colonial and Mr. Silverstein.[4]

On May 17, 2005, Colonial filed a proof of claim for the secured amount of $9,634.02.[5]

The home subject to Colonial's mortgage was damaged by Hurricane Katrina in August 2005, and was demolished by the City of New Orleans.

Colonial received $5,972.92 in insurance proceeds for Spain Street from Safeco Insurance.[6]

On December 30, 2005, Debtor filed a Notice of Change of Address updating his mailing address to 133 Labouef Street, New Orleans, Louisiana ("Labouef Street").[7]

---

[3] Pleading 7.

[4] Pleading 9.

[5] Claim no. 4.

[6] Exhibit Debtor 1.

[7] Pleading 34.

2

Confirmation of Debtor's Plan came before the Court on June 6, 2006.[8] The Order scheduling the confirmation hearing was served on both Colonial and Mr. Silverstein.[9] Colonial did not object to confirmation, and this Court confirmed Debtor's Plan by Order dated June 9, 2006.[10] The Order confirming the Plan was served on both Colonial and Mr. Silverstein.[11] Colonial neither appealed nor asked for reconsideration of the Order confirming the Plan.

On July 22, 2008, Colonial sent to Debtor's counsel a letter stating that Debtor did not make any payments to Colonial outside of the Plan and demanding the amount of $11,400.78.[12] The office of Debtor's counsel replied to Colonial by letter dated July 31, 2008, stating that Debtor's counsel was unavailable due to a family emergency and requested an additional two weeks to research the matter.[13]

On August 27, 2008, Colonial, through its attorney Mr. Silverstein, filed a Motion for Relief from the Automatic Stay.[14]

---

[8] Pleading 56.

[9] Pleading 57.

[10] Pleading 60.

[11] Pleading 61.

[12] Exhibit Colonial 7.

[13] Exhibit Colonial 8.

[14] Pleading 66.

On September 8, 2008, Trustee filed a statement that Debtor had completed all Plan payments.[15] Debtor was discharged on September 9, 2008, and both Colonial and Mr. Silverstein were served with the Order discharging Debtor ("Order of Discharge").[16]

Following Debtor's discharge, on September 19, 2008, Colonial, through its attorney Mr. Silverstein, filed a Motion to Dismiss its Motion for Relief from the Automatic Stay,[17] which was granted by the Court.[18]

On September 16, 2008, Colonial, through its attorney Mr. Silverstein, reactivated the Foreclosure Suit without amending the amount due or the address at which to serve Debtor, which was still listed as Spain Street.

On October 24, 2008, Colonial requested the appointment of a curator in the Foreclosure Suit stating that it had been unable to serve Debtor.[19]

On October 31, 2008, Debtor filed a second Notice of Change of Address in his bankruptcy case updating his mailing address to 1315 Lesseps Street, New Orleans, Louisiana ("Lesseps Street").[20] The record reflects that Mr. Silverstein received email notification that the Notice of Change of Address had been filed, and the Docket Sheet reflects that Lesseps Street is Debtor's current address.

---

[15] Pleading 69.

[16] Pleading 70.

[17] Pleading 72.

[18] Pleading 89.

[19] Exhibit Debtor 6 en globo.

[20] Pleading 74.

On December 3, 2008, Trustee filed a Final Report and Account showing that Colonial's proof of claim for $9,634.02 was paid in full. Approval of the Final Report and Account was set for hearing on January 13, 2008.[21] The Final Report and Account and the Notice of Hearing were served on both Colonial and Mr. Silverstein.[22]

On December 17, 2008, the Curator filed "Curator's Note of Evidence" stating that the Curator placed an ad in the Times Picayune on November 22, 23, and 24 as well as mailing a letter to Debtor.[23]

On December 18, 2008, Spain Street was sold at Sheriff's Sale to Colonial.

Colonial did not object to the Final Report and Account, and this Court approved the Final Report and Account by Order dated January 13, 2009.[24] The Order approving the Final Report and Account was served on Mr. Silverstein.[25] Colonial neither appealed nor asked for reconsideration.

On January 23, 2009, Debtor filed the Motion alleging that after the Debtor's discharge, Colonial proceeded with a previously filed Motion for Executory Process in Orleans Parish, and as a result, Spain Street was sold at a Sheriff's Sale.

---

[21] Pleading 75.

[22] Pleading 76.

[23] Exhibit Debtor 6 en globo.

[24] Pleading 78.

[25] Pleading 79.

Colonial alleges that it is still owed $3,659.41 in prepetition debt and $6,198.58 in postpetition expenses.[26] It admits that its proof of claim was for $9,634.02 but avers that this represents only the arrearages due as of the Petition Date and that additional amounts were owed but not included in its proof of claim.

**Law and Analysis**

A chapter 13 bankruptcy filing allows an individual to repay his debts over a thirty-six to sixty month period. Often the chapter 13 debtor is in default on a number of obligations at the time of the filing. The most common default is on home mortgage loans.

Under chapter 13, a debtor can propose repayment of any past due amounts on a home loan through regular payments under a plan of reorganization. The past due balance is often only a portion of the entire debt that is due. After confirmation, the unmatured balance continues to mature while the case proceeds. To cover this portion of the debt, plans generally propose one of two treatments: 1) either the debtor continues to pay his regular monthly note to the lender in addition to the plan payment ("regular pay plan") or 2) the entire debt is repaid over the term of the plan at an adjusted amortization rate ("all inclusive plan").

Under regular pay plans, only the arrearage is satisfied through payments by the trustee. The unmatured remaining balance of the loan is reinstated and repaid under its original contractual terms, which often extend beyond the plan's conclusion. The regular pay plan is a type of reaffirmation, allowing the debtor to amortize or workout a large past due balance while continuing to honor the terms of his original loan going forward.

---

[26] These expenses are primarily associated with Colonial's post-discharge collection efforts.

6

An all inclusive plan is designed to fully payoff all obligations to the lender within the plan's terms.

In either case, the plan sets forth in clear terms the debtor's intentions and at the end of the plan, past due sums have been satisfied.

Proofs of claim are sworn statements under penalty of perjury,[27] filed by claimants setting forth *all* amounts owed by a debtor to the claimant. The proof of claim reflects all debt, whether due or not yet matured, as of the petition date. The purpose of a proof of claim is to provide a statement of the amounts due so that a debtor can formulate a plan for repayment and receive, on completion, a discharge and fresh start.[28]

Upon discharge, a debtor is free from all obligations, not otherwise excepted from discharge, incurred before the petition date. If a creditor receives notice of the bankruptcy proceeding and fails to file a proof of claim, its debt is discharged along with those who participated in the case.

A proof of claim is "prima facie evidence of the validity and *amount* of the claim" and is "deemed allowed" unless an Objection is filed.[29] The Fifth Circuit, in *Sun Finance Company, Inc. v. Howard*[30], held that the amount of the secured creditor's proof of claim controls the amount due unless an Objection to the proof of claim is sustained. Chapter 13 plans do not control the amounts due a secured creditor, but their proofs of claim do.

---

[27] *In re Cunningham*, 2008 WL 1696756, *15 (Bankr.N.D.Tex. 2008)

[28] *Id.*; *In re Bargdill*, 238 B.R. 711, 717 (Bankr.N.D.Ohio 1999).

[29] 11 U.S.C. § 502(a) and FRBP 3001(f) (emphasis added).

[30] *Sun Finance Company, Inc. v. Howard*, 972 F.2d 639 (5th Cir. 1992).

Trustee routinely objects to the confirmation of plans that fail to provide for payment to a secured home mortgage lender in an amount equivalent to its proof of claim. Conversely, when a proof of claim is filed for a lesser amount than is provided by a plan, Trustee will adjust the amount to be paid to the creditor to match the proof of claim. Because a proof of claim is a sworn statement by the creditor of the total obligations owed, the claimant may not receive more than full payment for the debt reflected on the proof of claim. Any amounts collected over and above that sum are then paid to unsecured claimants, increasing their distributions.

Colonial contends that its proof of claim reflected only the past due amounts owed and that it mistakenly omitted the remaining unmatured balance.[31] Colonial assumed Debtor was in a regular pay plan and would continue to make payments equal to the note's monthly installments of $228.48 in addition to his payments on the Plan. As a result, Colonial mistakenly failed to include the remaining balance in its proof of claim.[32]

Even Colonial's explanation as to why it omitted some of its debt from its proof of claim does not match the facts of this case. Since Colonial had already accelerated the entire debt and instituted the Foreclosure Suit, the entire debt was actually past due. Taking Colonial at its word that only accrued debt should be included would still require it to list all amounts upon which it sued. Putting aside the fact that Colonial had accelerated its debt, it still failed to include in its proof of claim costs associated with collection of the past due balance incurred and due on the Petition

---

[31] As of the Petition Date, Colonial was actually owed $19,345.79; comprised of $12,647.22 in principal, $3,424.42 in costs, and $3,274.35 in accrued interest. Costs included a refundable deposit of $1,200.00 held by the Sheriff.

[32] Colonial misses the point. Regardless of the type of plan proposed, all amounts, matured or unmatured on the Petition Date are reflected on the proof of claim.

Date. Colonial's failure to itemize the calculation of the debt owed in its proof of claim made discovery of this error impossible for Debtor or Trustee.

In this case, Debtor estimated Colonial's debt at $15,000.00 in his Plan and proposed to pay the entire sum with interest in monthly installments of $333.33.[33] After the Plan was filed, Colonial filed a proof of claim for $9,634.02 representing this sum as the total debt due. Because the proof of claim did not itemize the amounts claimed, it was impossible for Debtor or Trustee to ascertain how the calculation of debt was made.

Debtor borrowed $12,647.22 from Colonial in 1999.[34] The loan proceeds were for home improvements.[35] After making payments for five years, Debtor began asking Colonial for a payoff balance which was not provided. When Debtor complained of Colonial's lack of attention to his granddaughter-in-law, Darlene Shepard, she attempted to assist him. She too made several requests for a payoff to no avail. Frustrated by this lack of cooperation, Debtor stopped paying Colonial which caused a default.

When Ms. Shepard learned that Debtor had unilaterally stopped paying on the Colonial loan, she referred Debtor to legal counsel who filed this bankruptcy.

Debtor is elderly but in control of his faculties. The Court was impressed with his attention to detail and his consistent and timely payments to Trustee postpetition. Debtor's testimony

---

[33] Plans are filed within two weeks of the petition date and prior to the filing of proofs of claim. They typically estimate the balance due on secured debt unless a payoff can be obtained shortly after filing. For this reason, prior to confirmation, plans are specifically reviewed to assure that they provide sufficient funds to pay secured, allowed, and subsequently filed proofs of claim.

[34] Exhibit Debtor 2.

[35] Debtor's loan carried a ten year amortization at 17.97% interest. *Id*.

9

regarding unanswered requests for a payoff from Colonial was highly credible.

Ms. Shepard was also highly credible. At the time she was assisting Debtor with his problems, she was a law student.[36] The Court found her to be articulate, knowledgeable, and thorough. Ms. Shepard testified that as a result of Hurricane Katrina, she knew Colonial had received some amount in insurance proceeds for damage to Debtor's home. However, neither she nor Debtor knew the amount received nor did they know the balance of the loan because attempts to get a payoff had been unsuccessful. Both Debtor and Shepard explained that the estimate of $15,000.00 contained in the Plan was a guess as to the maximum amount owed.

Since Colonial had failed to send Debtor a requested payoff and the costs and fees associated with the Foreclosure Suit were not disclosed to Debtor, it was not unreasonable for Debtor to assume that Colonial's proof of claim was correct. Based on the testimony of the witnesses, the Court concludes that Debtor had no reason to question the amount provided by Colonial in its proof of claim.

This case was under the Court's supervision for over three years. During that time, Debtor made regular monthly payments to Trustee as required by the confirmed Plan.

Colonial is a sophisticated party and was represented by counsel throughout these proceedings. Both Colonial and its counsel received notice of all pleadings, hearings, and orders entered in this case. They received copies of the Plan, the Confirmation Order, Trustee's Final Report and Account, and the Order of Discharge.

While the Court accepts at face value that Colonial made a mistake in the execution of its proof of claim, Colonial's actions with regard to collection on the omitted balance cannot be

---

[36] She has since graduated.

characterized as accidental. There is no question that Debtor completed his plan, was discharged, and given a fresh start from any prepetition obligations owed to creditors with actual knowledge of the case. A discharge enjoins the "commencement or continuation of an action" to collect a discharged debt ("Discharge Injunction").[37] This includes collection efforts on prepetition obligations even if they are mistakenly omitted by the creditor on its proof of claim.

Following entry of the Order of Discharge, Colonial reactivated the Foreclosure Suit against Debtor. When it was advised of the discharge by Debtor's counsel, a fact that Colonial already knew,[38] Colonial refused to acknowledge the discharge's effect. This necessitated Debtor's Motion.

### Damages and Sanctions

"The discharge injunction is the equivalent of a court order."[39] Pursuant to 11 U.S.C. § 105 civil contempt proceedings are proper "to coerce compliance with a court order or to compensate another party for the contemnor's violation."[40]

Colonial violated the Discharge Injunction by activating its Foreclosure Suit after Debtor's debt to Colonial had been discharged. Colonial, through Mr. Silverstein, proceeded with the Sheriffs

---

[37] 11 U.S.C. § 524.

[38] Martin Aronovitch, owner of Colonial, testified that Colonial knew that Debtor had been discharged and asked Mr. Silverstein to withdraw Colonial's Motion for Relief from Stay on that basis.

[39] *In re National Gypsum Co.*, 118 F.3d 1056, 1064 (5th Cir. 1997).

[40] *In re Terrebonne Fuel and Lube, Inc.*, 108 F.3d 609, 612-613 (5th Cir. 1997).

11

Sale of Debtor's property without amending either the amount due[41] or Debtor's address for service, even though Mr. Silverstein received notice that Debtor had a new address.

The Court finds that the actions of Colonial and its counsel were egregious. Debtor has been deprived of the title to his property without notice and based on the collection of a discharged debt. Colonial's failure to notify Debtor of its intention to collect this debt shows a callous disregard for due process. On the date Colonial requested the appointment of a curator in the Foreclosure Suit, Colonial's attorney was aware, through notice received in this case, that Debtor was residing on Labouef Street. However, Colonial's counsel failed to advise the Sheriff of Debtor's new address, instead directing service on Debtor at Spain Street. When attempts to serve Debtor at Spain Street were unsuccessful, Colonial requested appointment of a curator. Seven days after the request was made, Colonial's counsel received an updated notice of change of address for Debtor, identifying his residence as Lesseps Street. When Colonial's attorney learned of Debtor's new address on Lesseps Street, he should have notified the newly appointed curator of this development. Instead, he did nothing.

Colonial foreclosed on this property through an affidavit to the state court representing that Debtor could not be found. This constitutes a shocking breach of its duty of candor to the court and an unacceptable level of indifference to its obligation to comply with due process.

The debt Colonial claimed as due, postdischarge, was comprised of unclaimed prepetition debt and costs associated with its ill advised postdischarge foreclosure. As this Court has explained,

---

[41] Assuming Colonial believed it could continue to collect sums still outstanding after the satisfaction of its proof of claim, it failed to amend its Foreclosure Suit to reflect the actual, reduced amounts owed. By taking this "shortcut," Colonial avoided service of process on Debtor.

12

the prepetition sums were discharged. It follows then that Colonial's collection efforts to recoup costs to collect a discharged debt were also improper.

Colonial avers that it proceeded to collection because Debtor failed to make any direct payments while his case was pending.[42] Debtor's Plan was all inclusive and not a regular pay plan, so of course, no installments were contemplated in excess of those made within the Plan. Even allowing for confusion by Colonial, the Court cannot comprehend why Colonial waited over three years to take any action on what it believed to be a plan default. Instead, Colonial slept on rights it assumed it had, notified no one, and then after discharge attempted to collect a prepetition debt it failed to disclose was due. Thirty-six missed direct payments should have alerted Colonial that something was amiss. As it turns out, it was Colonial's assumptions.

Because the Court finds Colonial's conduct to be inexcusable, egregious, and intentional, Colonial will be fined the sum of $10,000.00 in sanctions, payable to Debtor. Colonial is also ordered to return title to Debtor's property to him, free and clear of all liens or encumbrances of any nature. The Court will enter a separate Order in accordance with these Reasons.

New Orleans, Louisiana, July 2, 2009.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

---

[42] Had Debtor's Plan been a regular pay plan, Debtor's failure to make installment payments to Colonial would constitute a default under the Plan, entitling Colonial to seek relief.

13